UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| T.H., *et al.*, | : | Case No. 1:14-cv-516 |
| | : | |
| Plaintiffs, | : | Judge Timothy S. Black |
| vs. | : | |
| | : | |
| CINCINNATI PUBLIC SCHOOL | : | |
| DISTRICT BOARD OF EDUCATION | : | |
| | : | |
| Defendant. | : | |

**ORDER DENYING PLAINTIFFS'
MOTION FOR TEMPORARY RESTRAINING ORDER (Doc. 2) AND
GRANTING DEFENDANT'S MOTION TO DISMISS (Doc. 5)**

This civil case is before the Court on Plaintiffs' motion for a temporary restraining order (Doc. 2), Defendant's memorandum contra and motion to dismiss (Doc. 5), and Plaintiffs' reply (Doc. 6). The Court conducted oral argument and a hearing on June 26, 2014, at which Plaintiff K.H. testified.

**I.     BACKGROUND FACTS**

Plaintiff T.H., the 10-year-old child of Plaintiffs K.H. and D.H., has been diagnosed with autism, down syndrome, speech apraxia, sensory integration dysfunction, and cognitive impairment, among other disabilities . (Doc. 1 at 2). T.H. is nonverbal and uses an iPad as a Speech Generating Device (SGD) to communicate. (Doc. 2-1 at ¶ 9). T.H. is enrolled in the public school system operated by the Cincinnati Public School Board of Education (CPS) and recently completed fourth grade. (Doc. 1 at 2, 4).

1

CPS[1] found T.H. eligible for special education services in 2006 as a result of autism and has provided him with Extended School Year (ESY) services since 2007. (Doc. 1 at 3; Doc. 8-2 at ¶ 7).  T.H. attended a program at Stepping Stones in the summers of 2007 and 2008, complemented with one-on-one services from a paraprofessional, and, during 2008, he also received services from an Occupational Therapist (OT) and a Speech Language Pathologist (SLP).  (Doc. 8-2 at ¶ 7).  From 2009-2013, T.H.'s ESY services were in a structured classroom with a teacher for the month of June.  (*Id.*)  During the summer of 2009, T.H. also received services from an OT and SLP during the months of July and August.  (*Id.*)

D.H., the mother of T.H., testified at the June 26 hearing that many of the activities at Stepping Stone involved a nearby lake or pool, which T.H. was not able to participate in because of his SGD.  D.H. also testified that T.H. appeared physically exhausted after each day at Stepping Stone, which he attended on non-consecutive days.

At the request of his parents, T.H. transferred to Silverton Paidaia Academy for the 2013-2014 school year, and he made educational progress for the first time, most notably in his engagement in the academic environment.  (Doc. 1 at 4; Doc. 2-1 at ¶ 10; Doc. 8-4 at ¶ 4).  CPS ensured that T.H. was placed in a class taught by Annie Ashcraft, a licensed Intervention Specialist, with a background in teaching children with autism. (Doc. 1 at 4; Doc. 8-2 at ¶ 5; Doc. 8-4 at ¶ 5).

---

[1] Defendant asserts that its proper designation is Board of Education of the City School District of the City of Cincinnati.  (Doc. 5 at 1).

The members of T.H.'s Individualized Education Program (IEP) team met on January 28, 2014 to evaluate his IEP but deferred making a determination on his ESY services until they gathered more information.  (Doc. 8-2 at ¶ 8).  On March 13, 2014, Lori Rosen, a Student Services Manager with CPS, met with Ashcraft to determine the ESY services that CPS would provide to T.H.  (Doc. 1 at 4; Doc. 8-2 at ¶ 8).  CPS determined that T.H. was eligible for ESY services and proposed two options: an ESY classroom program at Silverton taught by Ashcraft for four weeks in June or a program at the Cincinnati Recreation Center.  (Doc. 1 at 5; Doc. 8-2 at ¶ 8).  Plaintiffs rejected these proposals and expressed their desire that T.H. be placed at either Applied Behavior Services (ABS) or the Cincinnati Center for Autism (CCA).  (Doc. 1 at 6; Doc. 8-2 at ¶ 11).

The IEP team met again on March 20 and 25, 2014 to discuss T.H.'s eligibility for ESY services and specific placement options.  (Doc. 1 at 5-6; Doc. 8-2 at ¶ 10).  The IEP team determined that T.H. was eligible for ESY to maintain skills in reading, math, and communication.  (Doc. 8-2 at ¶ 10).  At the meetings, Plaintiffs again suggested ESY services through ABS or CCA.  (Doc. 1 at 6; Doc. 8-2 at ¶ 11).  Plaintiffs indicated they were amenable to placement in Ashcraft's class at Silverton during June, but they did not agree to the proposals for the remainder of the summer, which ran during July and until August 7.  (Doc. 8-2 at ¶¶ 11-14).

During the IEP meetings, Rosen discussed several other ESY options for July and August in response to Plaintiffs' concerns, including a customized program at Stepping

3

Stones or 4.5 hours of one-on-one instruction from an Intervention Specialist and SLP. (Doc. 8-2 at ¶ 14).

On March 27, CPS provided Plaintiffs with a Prior Written Notice (PWN) indicating that the district rejected the Plaintiffs' request to place T.H. at either ABS or CCA and outlining the ESY options that CPS did propose. (Doc. 8-2 at ¶ 16, Ex. 6). Plaintiffs made an informal request to Rosen via email on April 11 for CPS to reconsider its ESY service offerings. (*Id*. at ¶ 16, Ex. 7).

On April 22, Plaintiffs accepted CPS' offer of the four-week program at Silverton, but rejected the proposals made for the months of July and August. (*Id*. at ¶ 16, Ex. 8). In a second PWN, issued on May 8, CPS acknowledged Plaintiffs' partial acceptance and again stated its additional proposal of 4.5 hours of one-on-one instruction from an Intervention Specialist and SLP. (*Id*. at ¶ 16, Ex. 9).

On May 6, Plaintiffs requested a meeting with Kevin Jamison, the Assistant Director of the Department of Student Services, which was held a few days later. (Doc. 8-2 at ¶ 16). CPS sent another PWN on May 9, after the meeting with Jamison, that again explained that CPS rejected placement at ABS and CCA because CPS's proposals satisfied the ESY goals identified for T.H. (*Id.* at ¶ 16, Ex. 10). Nevertheless, CPS again made adjustments to its ESY proposal for July and August based on concerns raised at the meeting by Plaintiffs and Teri Messerschmidt, a Speech-Language Pathologist II at The Kelly O'Leary Center for Autism Spectrum Disorders, about T.H.'s difficulty transitioning to unfamiliar locations and people. (*Id.*, Ex. 10). The new proposal included an extra hour each week with an Intervention Specialist in July and August,

4

eight hours of instruction from the same Intervention Specialist during the final week of the program at Silverton to allow T.H. to become accustomed to her, and transition services in late August before the start of the new school year. (*Id.*)[2]

D.H. testified that after receipt of the May 9 PWN she knew for certain that CPS was not going to accept her proposal of placement at CCA and retained their attorney shortly thereafter. Plaintiffs filed for a Due Process hearing in mid-June and filed the instant motion for temporary restraining order on June 20. The parties are scheduled for mediation pursuant to the Ohio administrative process on June 30.

## II. STANDARD OF REVIEW

Plaintiff bears the heavy burden of demonstrating entitlement to injunctive relief. An "injunction is an extraordinary remedy which should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it." *Overstreet v. Lexington-Fayette Urban Cnty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002).

In determining whether to grant injunctive relief, this Court must weigh four factors: (1) whether the moving party has shown a strong likelihood of success on the merits; (2) whether the moving party will suffer irreparable harm if the injunction is not issued; (3) whether the issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuing the injunction. *Id.* These

---

[2] The record presents conflicting evidence in numerous areas that the Court is unable to resolve upon the undeveloped record before it. This includes the exact nature of the services provided by Stepping Stones, CCA, and ABS, including such as whether they utilize an Intervention Specialist in the classroom. (Doc. 1 at 6-7; Doc. 8-2 at ¶¶ 11, 16-17). The record is also unclear as to the opinion of several IEP team members on the appropriateness of CPS's ESY proposals, the team members' qualifications and educational background, and the exact specifications of the ESY proposals.

four considerations are factors to be balanced, not prerequisites that must be met. *McPherson v. Mich. High Sch. Athletic Ass'n, Inc.*, 119 F.3d 453, 459 (6th Cir. 1997). "Although no one factor is controlling, a finding that there is simply no likelihood of success on the merits is usually fatal." *Gonzales v. Nat'l Bd. of Med. Exam'rs,* 225 F.3d 620, 625 (6th Cir. 2000). Moreover, when addressing a temporary restraining order, the "emphasis… [is] on irreparable harm given that the purpose of a temporary restraining order is to maintain the status quo." *Id.* (citing *Motor Vehicle Bd. of Calif. v. Fox*, 434 U.S. 1345, 1347 n.2 (1977)).

### III.     THE INDIVIDUALS WITH DISABILITY EDUCATION ACT

The Individuals with Disabilities Education Act (IDEA) "requires that school districts receiving federal funding provide a free and appropriate public education (FAPE) to all special education students." *Long v. Dawson Springs Indep. Sch. Dist.*, 197 F. App'x 427, 432 (6th Cir. 2006) (citing 20 U.S.C. § 1412; *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 179 (1982)). A FAPE "consists of educational instruction specially designed to meet the unique needs of the handicapped child, supported by such services as are necessary to permit the child 'to benefit' from the instruction." *Rowley*, 458 U.S. at 188-89. Although the school district must provide specially designed instruction, the Supreme Court has advised that this does <u>not</u> require "the furnishing of every special service necessary to maximize each handicapped child's potential." *Id.* at 199. Instead, the education provided must be "sufficient to confer some educational benefit." *Id.* at 200. IDEA requires school districts to develop an IEP for each child with a disability:

> Prepared at meetings between a representative of the local school district, the child's teacher, the parents or guardians, and, whenever appropriate, the disabled child, the IEP sets out the child's present educational performance, establishes annual and short-term objectives for improvements in that performance, and describes the specially designed instruction and services that will enable the child to meet those objectives.

*Honig v. Doe*, 484 U.S. 305, 311 (1988); *see* 20 U.S.C. § 1414(d).

In certain circumstances, a school district may be required to provide ESY services as part of an IEP to ensure that a student receives a FAPE. *Cordrey v. Euckert*, 917 F.2d 1460, 1470 (6th Cir. 1990). The Sixth Circuit has provided that "an ESY would be appropriate if it would prevent significant regression of skills or knowledge retained by the child so as to seriously affect his progress toward self-sufficiency." *Kenton Cnty. Sch. Dist. v. Hunt*, 384 F.3d 269, 278 (6th Cir. 2004) (quoting *Cordrey*, 917 F.2d at 1470). While noting that "it does seem arbitrary to assume even provisionally that the regular 180-day school year designed for normal learning abilities could also meet the unique needs of a severely handicapped child," the Sixth Circuit has held that "providing an ESY is the exception and not the rule under the regulatory scheme." *Cordrey*, 917 F.2d at 1473. Accordingly, "it is incumbent upon those proposing an ESY for inclusion in the child's IEP to demonstrate, in a particularized manner relating to the individual child, that an ESY is necessary to avoid something more than adequately recoupable regression." *Id.*

In *Cordrey*, the Sixth Circuit interpreted and retreated from its prior standard that "a child must prove his need for an ESY empirically, based on evidence of prior regression and slow recoupment without summer programming." *Cordrey*, 917 F.2d at

7

1470. After concluding that a standard requiring "hard empirical proof" of prior regression was "unfair" and inconsistent with the objectives of the IDEA, the new standard was established "not to require absolutely that a child demonstrate that he has regressed in the past to the serious detriment of his educational progress in order to prove his need for a summer program. Instead, where there is no such empirical data available, need may be proven by expert opinion, based upon a professional individual assessment." *Id.* at 1472.

"If the child benefits meaningfully within his potential from instruction under a proper IEP over a regular school year, then ESY service may not be required under the Act unless the benefits accrued to the child during the regular school year will be significantly jeopardized if he is not provided an [ESY]." *Id.* To meet this burden, "it must be shown that an ESY is 'necessary to permit [the child] to benefit from his instruction' and this benefit must be more than merely *de minimis*, gauged in relation to the child's potential." *Id.*

### IV. EXHAUSTION OF ADMINISTRATIVE REMEDIES

If a dispute arises related to a student's IEP, the statute requires plaintiffs to "exhaust their administrative remedies before bringing suit in federal court to obtain relief that is also available under the [IDEA]." *Covington v. Knox County Sch. Sys.*, 205 F.3d 912, 915 (6th Cir. 2000) (citations omitted). The exhaustion requirement "enables the agency to develop a factual record, to apply its expertise to the problem, to exercise its discretion, and to correct its own mistakes, and is credited with promoting accuracy,

efficiency, agency autonomy, and judicial economy." *Donoho ex rel. Kemp v. Smith Cnty. Bd. of Educ.*, 21 F. App'x 293, 296-97 (6th Cir. 2001) (emphasis supplied).

The IDEA establishes the following exhaustion requirement:

> Nothing in this chapter shall be construed to restrict or limit the rights, procedures, and remedies available under the Constitution . . . or other Federal laws protecting the rights of children with disabilities, except that before the filing of a civil action under such laws seeking relief that is also available under this subchapter, the procedures under subsections (f) and (g) of this section shall be exhausted . . . .

20 U.S.C. § 1415(*l*).

Subsections (f) and (g) provide for a two-tiered administrative procedure: (1) an impartial due process hearing pursuant to 20 U.S.C. § 1415(f); and (2) a state level review process pursuant to 20 U.S.C. § 1415(g). *See also* Ohio Rev. Code Ann. § 3323.05; Ohio Admin. Code § 3301-51-08. Parties aggrieved by the decisions resulting from the due process hearing and state level review then have "the right to bring a civil action." 20 U.S.C. § 1415(i)(2); O.A.C. § 3301-51-08(I).

In certain limited circumstances, plaintiffs need not exhaust their administrative appeals before filing a lawsuit in federal court. The Sixth Circuit recognizes several "narrow exceptions" to the exhaustion requirement. *See Crocker v. Tenn. Secondary Sch. Athletic Ass'n*, 873 F.2d 933, 936 (6th Cir. 1989). The exceptions expressly recognized in the Sixth Circuit are when exhaustion would be "futile or inadequate" to protect the claimant's rights, and when parents are not given full notice of their procedural rights under IDEA. *Id.* at 936-37. The burden of establishing the futility or inadequacy of the

9

administrative remedies rests on the party seeking to bypass them. *Honig*, 484 U.S. at 327.

At oral argument, Plaintiff's counsel urged this Court to invoke an exception based on the "severe and irreparable harm" that T.H. would allegedly suffer if Plaintiffs were required to exhaust their administrative remedies, an exception recognized by the First, Second, and Third Circuits. *See Rose v. Yeaw*, 214 F.3d 206, 211 (1st Cir. 2000); *Coleman v. Newburgh Enlarged City Sch. Dist.*, 503 F.3d 198, 206 (2d Cir. 2007); *Kominos ex rel. Kominos v. Upper Saddle River Bd. of Educ.*, 13 F.3d 775, 778-79 (3d Cir. 1994).

The so-called irreparable harm exception draws its support from the legislative history to a prior iteration of IDEA, in which a House Report provides that exhaustion may not be required when "an emergency situation exists (*e.g.*, the failure to take immediate action will adversely affect a child's mental or physical health)." H.R. Rep. No. 99-296, at 7 (1985). These Circuits unanimously caution that the irreparable harm exception "is to be sparingly invoked." *Coleman*, 503 F.3d at 206; *Rose*, 214 F.3d at 211; *Kominos*, 13 F.3d at 779.

The Sixth Circuit has never expressly adopted the irreparable harm exception. The appeals court has cautioned that <u>although</u> the "<u>need for swift action</u> which administrative procedures cannot provide <u>may justify an exception</u> to the exhaustion requirement, <u>no exception will be made where plaintiffs assert an emergency that is in fact 'a problem of their own making</u>.'" *Crocker*, 873 F.2d at 937 (citation omitted) (emphasis supplied).

10

Plaintiffs must first establish an exception to the exhaustion requirement before this Court can proceed to the merits of their claim for injunctive relief.  *See Crocker*, 873 F.2d at 937 ("We must dissolve [the district court's] injunction and dismiss this litigation, without reaching the Crockers' claims on the merits, because the Crockers have failed to avail themselves of mandatory, and effective, state procedures for resolving their dispute . . . ."); *Komninos*, 13 F.3d at 779 ("If plaintiffs satisfy the preliminary inquiry [of an exhaustion exception], the district court should then proceed with the traditional preliminary injunction procedures.").

Under the Third Circuit standard that Plaintiffs urge this Court to adopt, Plaintiffs bear a heavy burden to justify invocation of the irreparable harm exception.  "[M]ere allegations by plaintiffs of irreversible harm will not be enough to excuse the completion of administrative proceedings." *Kominos*, 13 F.3d at 779.  "<u>Plaintiffs must provide a sufficient preliminary showing</u> that the child will suffer serious and irreversible mental or physical damage (*e.g.*, irremediable intellectual regression)" as demonstrated <u>through</u> "<u>affidavits from competent professionals along with other hard evidence</u> that the child faces irreversible damage if the relief is not granted." *Id.* (emphasis supplied).  Reliance on case law analyzing the issue of regression after a final administrative decision is of limited value because those cases "differ from the one here where the critical question is whether there is such immediacy of harm as to preclude delay." *Id.* at 780.  Deference to the administrative process is appropriate if it "does not jeopardize the child's future progress to any substantial degree." *Id.*  Finally, the Third Circuit has noted that "<u>we</u>

11

doubt that 'regression' *per se* constitutes such irreparable harm as to justify an exception to the exhaustion requirement." *Id.* (emphasis supplied).

The Third Circuit has provided a telling commentary on the precise issues that this Court currently faces:

> The emergency situation exception differs from the others because of its dependence on the facts of a case and the interference created with the administrative proceedings in progress. The advantages of awaiting completion of the administrative hearings are particularly weighty in [IDEA] cases. That process offers an opportunity for state and local agencies to exercise discretion and expertise in fields in which they have substantial experience. These proceedings thus carry out congressional intent and provide a means to develop a complete factual record. *Smith v. Robinson*, 468 U.S. at 1011 (Congress made express efforts to place primary responsibility for fulfilling the needs of handicapped children on local and state education agencies). The administrative hearings generally will produce facts and opinions relevant to the very same issues presented to the court by plaintiffs.
>
> Disruption and interference with the state proceedings can have serious adverse effects. For instance, the duplication of effort in evaluating the same areas of controversy is a substantial detriment to consistency and procedural efficiency. Factors such as these counsel district courts to avoid premature intervention. The vitality of the carefully conceived administrative procedure, providing as it does for active, intense participation by parents, educational authorities, and medical personnel, must be preserved by the court's insistence upon proof of irreparable injury before allowing a party to bypass the exhaustion requirement.

*Kominos*, 13 F.3d at 779.

Upon review of the limited evidence before the Court, Plaintiffs have not satisfied their extraordinary burden of demonstrating that T.H. will suffer irreparable harm.

First, Plaintiffs do not offer evidence from persons with the requisite training and personal knowledge to provide a reliable basis for the Court to rule.

12

Plaintiffs offered the testimony of D.H., whom the Court found credible. The Court is hard pressed to imagine someone more familiar with T.H. than his mother, but her opinion testimony alone does not provide a sufficient basis to demonstrate irreparable harm. The only other evidence offered by Plaintiffs is the affidavit of Messerschmidt, a Speech-Language Pathologist II. However, Messerschmidt indicated that she "was involved with T.H. on a limited basis" during the 2013-2014 school year and based her statements on information reported by Ashcraft and other IEP team members, as well as her own limited observations of him in the classroom. (Doc. 2-1 at ¶¶ 8-10). The Court also notes that Plaintiffs have not produced evidence of the type required by Sixth Circuit precedent to succeed on the merits of an ESY claim, which mandates an "expert opinion, based on professional individual assessment." *See Cordrey*, 917 F.2d at 1470. Here, the testimony of D.H. and Messerschmidt is not sufficient to meet the Third Circuit's standard requiring "affidavits from competent professionals along with other hard evidence." *Komninos*, 13 F.3d at 781.

Second, the evidence presented does not demonstrate that T.H. will suffer "irremediable intellectual regression" or that his "regression will be irreversible." Messerschmidt's affidavit provides that T.H. is "at risk of serious regression without an appropriate, highly individualized ESY placement." (Doc. 2-1 at ¶ 18). Messerschmidt opines that the other ESY services offered by CPS are not sufficient to meet the needs of T.H., but she does not provide a basis to infer that

T.H. will suffer irreversible regression if he is placed at one of CPS's proposed ESY services.

Further, Defendants has presented evidence that, while not conclusive, places doubt on Plaintiffs' allegations that T.H. will suffer irreparable harm. Ashcraft, a licensed Intervention Specialist and T.H.'s teacher, indicates that the ESY services offered address his disability. (Doc. 8-4 at ¶ 8). A CPS administrator states that CPS uses Stepping Stones to provide ESY services to twenty-three other CPS students with autism. (Doc. 8-3 at ¶ 18). And Messerschmidt's affidavit describes her experience at Stepping Stones where she "developed programming, implemented trainings, and provided intervention services for students diagnosed with autism spectrum disorders." (Doc. 2-1 at ¶ 5).

Finally, the Court notes that this is not a case in which a child will be left utterly without services. Plaintiffs object to the sufficiency of the ESY services proposed by CPS for two months during the summer – but there is no wholesale refusal to provide ESY or even an adequate IEP. CPS has been responsive to the concerns raised by Plaintiffs, has adjusted its proposal several times, and has even provided multiple options. Plaintiffs have merely repeated their demand for placement at a private program and have made little or no effort to engage in a constructive dialogue with CPS.

This Court would overstep its bounds to invoke an exception to the exhaustion requirement not recognized by the Sixth Circuit, especially one other Circuits have cautioned "is to be sparingly invoked." The situation presented to the Court, including the undeveloped and conflicting record, does not justify excusing Plaintiffs from having

to exhaust the administrative process, a process which Congress specifically designed so to avoid this very issue. This Court deems it wise to heed the warning that "courts should be wary of foregoing the benefits to be derived from a thorough development of the issues in the administrative proceeding." *Komninos*, 13 F.3d at 780. And the Sixth Circuit has seemed to indicate a preference to err on the side of exhaustion. *S.E. v. Grant Cnty. Bd. of Educ.*, 544 F.3d 633, 643 (6th Cir. 2008) ("Although plaintiffs' futility argument has some appeal, we find that the issues raised by this litigation are best first addressed by the comprehensive administrative process Congress put in place for resolution of differences in the educational setting.").

This is especially so given that the delay in invoking the administrative process is largely attributable to Plaintiffs. Plaintiffs were aware in late March that CPS was not receptive to their requests. They knew that his program at Silverton would end on June 26, but continued to demand placement at CCA, even as the end date began to approach. Plaintiffs waited until mid-June to file their notice for a Due Process hearing. Finally, Plaintiffs filed in this Court a mere six days before T.H.'s services ended and requested immediate injunctive relief because the administrative process would not be fast enough to address the issues before the end date of his ESY services. As stated by the Sixth Circuit, "no exception will be made where plaintiffs assert an emergency that is in fact 'a problem of their own making.'" *Crocker*, 873 F.2d at 937 (emphasis supplied).

This Court finds that Plaintiffs failure to exhaust the administrative process should not be excused. Such a conclusion does not come without some angst, but the Court is compelled by well-established precedent.

15

## V. TEMPORARY RESTRAINING ORDER

The Court finds further that even if Plaintiffs could be excused for their failure to exhaust, they have also not met their burden necessary for the Court to grant the extraordinary remedy they seek.

### A. Likelihood of Success on the Merits

Given the undeveloped and contradictory record presented, this Court concludes that Plaintiffs have not demonstrated a strong likelihood of success on the merits. Plaintiffs' challenge is to the sufficiency of an ESY proposal, rather than the outright denial of ESY services.

The affidavit of Messerschmidt provides that T.H. is at "risk of significant regression" if he does not receive an appropriate ESY placement. (Doc. 2-1 at ¶ 18). Although the affidavit tends to establish that CCA is the optimal ESY placement for T.H., that is not the applicable standard. Not only must Plaintiffs prove that placement at CCA is "necessary to avoid something more than adequately recoupable regression," they must also prove that CPS's other ESY proposals would not meet that standard. *Cordrey*, 917 F.2d at 1473.

IDEA does not require "the furnishing of every special service necessary to maximize each handicapped child's potential"; instead, CPS is required to provide a program that is "sufficient to confer some educational benefit." *Rowley*, 458 U.S. at 199-200. The Court concludes that Plaintiffs have not shown a strong likelihood that CPS has failed to meet this standard.

**B.     Whether Plaintiff T.H. Would Otherwise Suffer Irreparable Injury**

Plaintiffs have not demonstrated that T.H. will suffer irreparable injury if immediate injunctive relief is not provided. As discussed above, CPS has made multiple proposals for ESY services to commence after T.H.'s program at Silverton ends. These proposals remain available for Plaintiffs to accept. The parties will also attempt mediation shortly after the issuance of this Order, and a Due Process hearing remains available.

**C.     Whether the Issuance of a Temporary Restraining Order Would Cause Substantial Harm to Others**

The Court finds that the interests that CPS and other school districts have in the administrative process would be substantially harmed if this Court were to grant injunctive relief. As detailed by the Third Circuit, "[d]isruption and interference with the state proceedings can have serious adverse effects." *Komninos*, 13 F.3d at 779. "The vitality of the carefully conceived administrative procedure, providing as it does for active, intense participation by parents, educational authorities, and medical personnel, must be preserved by the court's insistence upon proof of irreparable injury before allowing a party to bypass the exhaustion requirement." *Id.*

The Court finds persuasive the argument of Defendant's counsel that granting injunctive relief in this case could open up the flood gates for other parents to attempt to circumvent the administrative process.

### D. Whether the Public Interest Would be Served

The final element does not weigh strongly in either direction. The public undoubtedly has an interest in providing children with an appropriate education. The public also has an interest in maintaining the integrity of the administrative process and in proper allocation of public funds. *See Komninos*, 13 F.3d at 781 ("We recognize that the intense and commendable concern of the parents for the welfare of their child, as well as society's concern for protecting these children, must be weighed against the duty of school boards to carefully allocate their limited resources in fairness to all, as best as can be done.").

## VI. CONCLUSION

This case presents the emotional and difficult issue of balancing the education of a child with several disabilities against the need both to preserve a regulatory system that does not always provide an immediate answer and to preserve a finite public fisc. The law mandates that parents who wish to challenge whether a school district is providing a free and appropriate public education to their child must first utilize an administrative process specially designed to handle such matters. Plaintiffs have failed to do so.

Accordingly, Plaintiffs' motion for temporary restraining order (Doc. 2) is **DENIED**. Defendant's motion to dismiss (Doc. 5) is **GRANTED**, and this case is **DISMISSED WITHOUT PREJUDICE**. The Clerk shall enter judgment accordingly.

**IT IS SO ORDERED**.

Date: June 27, 2014 */s/ Timothy S. Black*
Timothy S. Black
United States District Judge